UNITED STATES of America

v.

The **BALTIMORE AND OHIO RAIL-ROAD COMPANY**, a corporation.

Crim. No. 28389.

United States District Court,
D. Maryland.

Nov. 24, 1970.

Stephen H. Sachs and George Beall, U. S. Attys., Baltimore, Md., for plaintiff.

Albert W. Laisy, Baltimore, Md., for defendant.

THOMSEN, District Judge.

The information filed by the United States Attorney in this case charges defendant railroad (B & O) with two violations of section 15(11) and (12) of the Interstate Commerce Act, 49 U.S.C.A. § 15(11) and (12). Section 15(11) provides in pertinent part:

"It shall be unlawful for any common carrier subject to the provisions of this Act, or any officer, agent, or employee of such common carrier, or for any other person or corporation lawfully authorized by such common carrier to receive information therefrom, knowingly to disclose to or permit to be acquired by any person or corporation other than the shipper or consignee, without the consent of such shipper or consignee, any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to such common carrier for interstate transportation, which information may be used to the detriment or prejudice of such shipper or consignee, or which may improperly disclose his business transactions to a competitor;
\* \* \*."

Section 15(12) provides that violation of any of the provisions of paragraph (11) of section 15 shall constitute a misdemeanor, punishable on conviction by payment to the United States of a penalty of not more than $1,000 for each offense.

The case has been submitted to the court without a jury on an agreed statement of facts,[1] summarized below.

B & O is a carrier subject to the provisions of the Act, with a station and agent at Luke, Maryland, where Westvaco[2] has a plant. The action concerns two shipments, each consisting of a carload of pine lumber. The first was tendered by Biles Coleman Lumber Co. to the Great Northern Railway Co. at Omak, Washington, as a C.O.D. shipment consigned to Empire Wholesale Lumber Co. (Empire) at Luke, Maryland. The other was tendered by Brooksscanlon, Inc., to the Oregon Trunk Railway at Bend, Oregon, as a C.O.D. shipment consigned to Empire at Luke. In each instance the name of the consignor and the name of the consignee were typed in the appropriate spaces on the waybill issued by the origin carrier. Both cars were duly transported by the origin carrier and connecting carriers, including B & O, to Luke, Maryland.

In each instance, while the shipment was en route, Empire sent to B & O's freight agent at Luke a "diversion or reconsignment order" on a printed form, prepared and filled out by Empire which:

(1) ordered B & O's freight agent to reconsign and deliver the carload shipment to Westvaco at Luke;

(2) ordered B & O to collect from Westvaco all freight, demurrage, customs, consignment, miscellaneous and similar charges connected with the shipment;

(3) contained a "caution", illustrated by a policeman blowing a whistle and stop sign, to show Empire, only, as the shipper on all copies of freight bills and not to show any other shipper's name anywhere on the freight bill; and

(4) contained a "warning" that disclosure of the original shipper's name to the ultimate consignee would violate section 15(11) and 15(12) and that it was Empire's policy to notify the ICC of "each and every violation".

Upon arrival of each shipment at Luke, B & O delivered the shipment to Westvaco, sending it a notice of constructive placement in accordance with the applicable demurrage rule. The B & O agent at Luke sent the original waybill to B & O's accounting office at Baltimore, so that it might determine the applicable rate and charges on the shipment and submit a collect freight bill to the new consignee, Westvaco. Before sending the waybills to the accounting office, the agent at Luke drew one or two lines through the name of the original shipper and inserted "Empire Wholesale Lumber Co." under it, and drew a line through Empire's name as consignee and inserted West Virginia Pulp and Paper Co. under it.

B & O's accounting office prepared the freight bills in accordance with its usual practice, adopted in the interests of speed and economy, by incorporating therein a photocopy of the waybill. The names of the original consignor and consignee were still legible on the copies of the waybills which were incorporated into the freight bills.

Westvaco made no use of the information with respect to the identity and address of the original consignors. It did not attempt to make purchases from the original consignors; it makes its lumber purchases through lumber brokers, such as Empire, and never attempts to make direct purchases from West Coast mills or producers, with one exception, the Weyerhaeuser Company. Moreover, the names of the original consignors were

1. Certain statements, based upon an affidavit, referred to in the statement of facts in this opinion, are not admitted by the Government, which takes the position that they are irrelevant and immaterial. The Government does not deny the truth of the statements, and the Court finds them relevant and material to the extent that the facts stated therein are used in this opinion.

2. Formerly known as West Virginia Pulp and Paper Co.

stamped on the ends of the lumber comprising the shipments involved in this case.

When Empire sent B & O the diversion and reconsignment order making Westvaco the consignee of the C.O.D. shipment, Westvaco became liable to pay the proper charges for the entire transportation. To determine whether the charges billed are proper, a new consignee may need to communicate with the original consignor to obtain the weight, quantity and quality of the shipment tendered to the original carrier, and other information about facts on which various charges are based.

The Government relies upon two early opinions or reports of the ICC. Those reports were correctly summarized in a later case, Mendell v. Long Island Railroad Co., 227 I.C.C. 278 (1938), as follows:

"In the original report in *Freight Bills*, 29 I.C.C. 496, an investigation proceeding, the Commission made the following comment with respect to a contention by certain shipping interests that disclosure by a common carrier to the ultimate consignee of the name of the original consignor of a shipment reconsigned in transit was in violation of section 15(11):

" 'If we stand upon the precise language of the clause quoted, it is not altogether clear that the law is definite enough to justify the latter construction; but in Alvree v. B. & M. R. R., 22 I.C.C. 303, 321, we have broadly held that the act indicates an intent upon the part of the Congress to secure to every shipper immunity from a disclosure of his business at the hands of a common carrier. We still regard this as a sound view of the law and as the construction to which carriers should adjust their practices.'

"In a supplementary report therein, 38 I.C.C. 91, the Commission concluded that the freight bill upon a reconsigned shipment should not disclose the name of the original consignor except with the consent of the original consignee, and further, that it should not reveal the original point of origin or the routing except where the ultimate consignee is required to pay the through charges. Disclosure by the carrier of the name of the original consignor to the ultimate consignee without the consent of the original consignee was there held to be inconsistent with the 'spirit' and 'purpose' of the provisions of section 15(11) and violative of the original consignee's 'right of privacy'. It was emphasized, however, that when, as in the instant proceeding, the ultimate consignee is called upon to pay the through charges from the original point of shipment, he is entitled to know whether the rate charged is applicable, and that, in order that this information may be available, the freight bill may reveal the origin and route of movement of the shipment." 227 I.C.C. at 279, 280.

*Mendell* was a claim for reparations and for a cease and desist order, which were denied. It is true, as the Government argues, that in order to receive an award of reparations in such a case the complainant had to prove that he had been damaged by the disclosure, while the Government has no such burden in this case.

However, as stated above, the diversion and reconsignment order made Westvaco the consignee of the C.O.D. shipment, liable to pay the proper charges for the entire transportation. Westvaco, the new consignee, was therefore entitled to know the name of the original consignor, in order to obtain from it the information necessary to determine whether the charges made were proper. To find B & O guilty of violating section 15(11) and (12) under the facts of this case would require the

Court to ignore both the letter and the purpose of the statute.[3]

The Clerk will enter a verdict of not guilty on both counts.

---

3. The Government notes that B & O has entered pleas of nolo contendere in one case and of guilty in one case in other districts and paid fines of $100. B & O replies that it was cheaper to pay such fines than to fight cases away from its home office, and notes that it was found not guilty in the one case which it contested, although the facts were admittedly different. Neither side has cited any court opinion on the question at issue.